OPINION
On June 11, 1998, defendant-appellant, Heather A. Kinney, was indicted by the Madison County Grand Jury on one count of aggravated vehicular homicide in violation of R.C. 2903.06(A). The charge stemmed from an incident that occurred on April 5, 1998. Appellant, while attempting to pass another vehicle in a no-passing zone, collided head on with another vehicle in the opposite lane, killing appellant's passenger. Following a bench trial,[1] appellant was found guilty as charged and sentenced accordingly.
The record reveals that on April 5, 1998, at about 8 p.m., appellant and her twelve-year-old passenger, Misty Thomas, were driving southbound on Plain City-Georgesville Road in Madison County, Ohio. Appellant, who had been baby-sitting Misty that day, was driving Misty back to Misty's mother's house.
Plain City-Georgesville Road is a straight, two-lane road. A hill crest precedes the intersection of Plain City-Georgesville Road and MV High Road. Drivers traveling southbound on Plain City-Georgesville Road are notified of the upcoming intersection with a yellow warning traffic sign. It is undisputed that the site where the collision occurred was a no-passing zone which was designated by a double-yellow line on the pavement. State Trooper Dan Cline of the West Jefferson Highway Patrol Post testified that the no-passing zone started four-tenths of a mile before the collision site in the southbound lane and two-tenths of a mile before the collision site in the northbound lane. The state trooper also testified that the collision occurred north of the intersection.
That evening, Cynthia Shreck was also driving southbound on Plain City-Georgesville Road. Shreck testified that she was driving at forty-five to fifty m.p.h. Frank Iezzi was driving northbound on Plain City-Georgesville Road. Iezzi testified he was driving at "40, 45 miles per hour." At or after the hill crest, as appellant crossed the double-yellow line attempting to pass Shreck, appellant collided head on with Iezzi. Iezzi testified that "just as [he was getting] out of the lowest part of the hill," he saw two sets of headlights, one in his lane of travel, and the other one in the opposite lane. Iezzi testified that "all [he] did was put [his] foot on the brake, stood on it and boom, we hit, pretty quick." Iezzi stated that he did not have time to swerve or take any other evasive action. Iezzi also stated that at the time of the collision, appellant's car and Shreck's car were "pretty much side by side."
Shreck first noticed appellant behind her at about a half mile to a mile from the site of the collision. Shreck stated that as she was approaching the site of the collision, appellant was gaining on her. Thereafter, Shreck "looked in [her] rear view mirror and noticed that there was someone behind [her]. I remember thinking that she was going to pass me as I came into the dip, and I remember — the only thing I really remember is, oh, dear Jesus, she's going to pass me. And that's basically it, in a flash." Shreck explained she was concerned that appellant was going to pass her because "[i]t was in a hill." Shreck testified that appellant's car was at her (Shreck's) driver's side passenger's back door when the collision occurred. While she did not see the collision, Shreck stated that the sound of the collision was very loud. On cross-examination, Shreck agreed that it was "fair to say that prior to the time that [appellant] passed [her], she was probably doing 45 or 50 miles per hour[.]"
State troopers and rescue units quickly responded to the accident. Benny Minturn, a firefighter paramedic, was one of the first people at the scene of the accident. Minturn first checked on Iezzi. Minturn then went to appellant's car where he noticed Misty "slumped over to the driver's seat." Appellant was out of her car. Misty had no pulse and was not breathing. Minturn testified that they unsuccessfully tried to revive Misty. Misty was eventually pronounced dead at the scene. As a result of the accident, Iezzi suffered several injuries and was hospitalized for ten days.[2]
Sergeant Steven Click of the West Jefferson Highway Patrol Post went to the hospital where appellant was being examined to talk to her. Appellant told him that "she had been coming down the road, that she attempted to pass and that there had been an accident." Appellant also told the officer that she was driving at fifty-five m.p.h. Appellant tested negative for both alcohol and drugs.
State Trooper Jeffrey Moseley, an accident reconstructionist with the Ohio State Highway Patrol, testified that according to his calculations, at impact appellant's vehicle was traveling between sixty-nine and seventy-one m.p.h., and Iezzi's vehicle was traveling at thirty-two m.p.h. Moseley testified that Iezzi's statement he was driving at forty to forty-five m.p.h. before the collision was consistent with Moseley's calculations. Moseley explained that Iezzi's act of braking without going to full lock-up (as evidenced by the absence of skid marks from Iezzi's car) most likely resulted in speed loss. Moseley testified, however, that appellant's statement she was driving at fifty-five m.p.h. was not consistent with his calculations. Moseley stated that had appellant really been driving at fifty-five m.p.h., that would have meant Iezzi would have been driving at less than twenty m.p.h.
At the close of the state's case, appellant moved for a judgment of acquittal under Crim.R. 29(A) on the ground that the state had failed to show appellant had "acted willfully, wantingly [sic] or in perverse disregard." The trial court cited this court's decision in State v. Gayheart (Sept. 8, 1997), Fayette App. No. CA97-01-001, unreported, for the proposition that "evidence of crossing a double-yellow line is an act which reflects a blatant disregard for the safety of others and is therefore a reckless act in itself," and denied the motion. Thereafter, the trial court recognized that this court's decision to affirm Gayheart's conviction for aggravated vehicular homicide was also based on Gayheart's speed. The trial court then added: "But the Court itself concludes that it constitutes reckless conduct, and therefore, in the first portion of that case deals with the motion for judgment of acquittal. The motion for dismissal is overruled."
At the close of the evidence, the trial court, "having seen the evidence,[3] heard the evidence, * * * and relying onState of Ohio versus Gayheart," found appellant guilty as charged and sentenced her accordingly. Appellant timely filed this appeal.
On appeal, appellant challenges her conviction for aggravated vehicular homicide in what appears to be a single assignment of error with two sub-issues. Appellant first argues that the trial court erred in denying her Crim.R. 29(A) motion when it improperly relied "completely on one statement from this Court dealing with the crossing of a double line." Appellant also argues that her conviction was against the manifest weight of the evidence. At the heart of both arguments is appellant's claim that the state failed to show beyond a reasonable doubt that appellant acted recklessly.
Under Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. This court's standard of review of a claim of insufficient evidence is set forth in State v. Jenks (1991), 61 Ohio St.3d 259, at paragraph two of the syllabus:
 An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781, * * * followed).
"In reviewing the weight of the evidence in a criminal conviction, if an appellate court finds that reasonable minds could reach the same conclusion as the trier of fact, then a verdict should not be disturbed." State v. Thomas (June 13, 1994), Butler App. No. CA93-03-046, unreported, at 6. The standard for reversal for manifest weight of the evidence has been summarized as follows:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
We first address appellant's argument that the trial court erred in denying her Crim.R. 29(A) motion on the ground that it improperly relied on this court's statement in Gayheart that "evidence of crossing the double-yellow line is an act which reflects a blatant disregard for the safety of others and is therefore a reckless act in itself."
While the trial court at first denied appellant's Crim.R. 29(A) motion by solely relying upon the foregoing statement, the record shows that the court then went on to recognize that this court's decision to affirm Gayheart's conviction was also based upon Gayheart's speed. The trial court then added, "[b]ut the Court itself concludes that it constitutes reckless conduct, and therefore, in the first portion of that case deals with the motion for judgment of acquittal. The motion for dismissal is overruled."
Unlike appellant, we find that the foregoing shows that the trial court did not overrule appellant's Crim.R. 29(A) motion solely on the basis of this court's statement regarding the crossing of a double-yellow line. In addition, we note that the statement as quoted by the trial court correctly reflects this court's holding regarding the crossing of a double-yellow line. A review of Gayheart shows that the statement stood by itself in the analysis and was not linked to any other evidence. Only after that statement did this court also consider evidence of speed.
We now turn to appellant's claim that the state failed to show beyond a reasonable doubt that she acted recklessly. Appellant was convicted of aggravated vehicular homicide under R.C. 2903.06(A), which states that "[n]o person, while operating or participating in the operation of a motor vehicle * * * shall recklessly cause the death of another * * *." R.C. 2901.22(C), in turn, defines recklessness as follows: "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." "Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances." State v. Logan (1979), 60 Ohio St.2d 126, 131.
In the case at bar, it is undisputed that appellant was passing another car in a no-passing zone, by crossing the double-yellow line, at or after a hill crest, and failed to see Iezzi's vehicle until it was too late to avoid a collision. As a result of the collision, appellant's passenger died. As already noted, we have held that "evidence of crossing the double-yellow line is an act which reflects a blatant disregard for the safety of others and is therefore a reckless act in itself." Gayheart, Fayette App. No. CA97-01-001, unreported, at 5. In this case, even greater recklessness was shown because the illegal passing was attempted at or about a hill crest where the visibility of oncoming cars was close to nil.
We also find that there was evidence that appellant was speeding. Shreck, whom appellant was trying to pass, testified that she was driving at forty-five to fifty m.p.h. Iezzi, with whom appellant collided, testified he was driving at "40, 45 miles per hour." State Trooper Moseley testified that Iezzi's statement was consistent with his calculations of Iezzi's speed at impact. Moseley also testified that according to his calculations, appellant's speed at impact was between sixty-nine and seventy-one m.p.h. Moseley testified that appellant's statement she was driving at fifty-five m.p.h. was not consistent with his calculations.
Appellant emphasizes that while Moseley calculated appellant's speed to have been, at impact, between sixty-nine and seventy-one m.p.h., the other drivers not only estimated their speeds at considerably less than that, but also stated that appellant was traveling at a much lower speed before she attempted to pass. However, this is not what the record shows.
While it is true that Iezzi and Shreck estimated their respective speeds to be considerably less than sixty-nine to seventy-one m.p.h., that does not mean appellant was traveling at the same speed as they were. Indeed, Shreck testified that she first noticed appellant at about a half mile to a mile from the site of the collision. Shreck stated that as she approached the site of the collision, appellant was gaining on her. When asked on cross-examination whether "it [would] be fair to say that prior to the time that [appellant] passed you, she was probably doing 45 or 50 miles per hour[,]" Shreck replied "yes." It is axiomatic that if Shreck was traveling at forty-five to fifty m.p.h., and if appellant was gaining on her, appellant was necessarily traveling at a higher speed than Shreck. It is also likely that while attempting to pass Shreck, appellant was traveling at a higher speed than Shreck.
We are mindful that there was no testimony as to the speed limit. However, the maximum speed limit in Ohio, except on interstate highways, is fifty-five m.p.h. R.C. 4511.21(B). This accident was not on an interstate highway, therefore the maximum speed limit could have been no more than fifty-five m.p.h.
After thoroughly reviewing the record, we find that it supports a finding that appellant was reckless. Appellant's calculated speed of sixty-nine to seventy-one m.p.h. on a two-lane road at or about a hill crest, driving on the wrong side of the road in a no-passing zone where the visibility of incoming vehicles was close to nil, evinces a perverse disregard of a known risk that there could be another vehicle coming in the opposite lane.
It is clear that appellant's "purpose" or "immediate motive" was not to take anyone's life. Nevertheless, it is also clear that appellant disregarded the significant possibility that her conduct and the related circumstances were likely to cause a particular consequence, or that there was good reason to believe or expect a particular result, i.e., a fatal automobile accident.
In accordance with the standards of review articulated above, we find that appellant's conviction for aggravated vehicular homicide was supported by sufficient evidence and that it was not against the manifest weight of the evidence. Appellant's sole assignment of error is overruled.
Judgment affirmed.
YOUNG, P.J., and VALEN, J., concur.
[1] Appellant had originally pled not guilty and was to be tried by a jury. However, on the day of the trial and before the proceedings began, appellant voluntarily waived her right to a jury trial.
[2] The record does not show what injuries, if any, appellant suffered as a result of the collision. The record shows, however, that at the urging of the state troopers, appellant went to the hospital after the collision to be checked.
[3] The record shows that the trial judge, in addition to the evidence submitted at trial, also viewed the site of the collision.